# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

WILLIAM PAVLOFF,

    Plaintiff,

v.                                          No. CV 07-0625 MCA/WPL

CHRISTINE J. SALAZAR-ARP,
HERMIN GONZALES,

    Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

On June 28, 2007, William Pavloff filed a complaint pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional and statutory rights by Christine Salazar-Arp. (Doc. 1.)[1] I ordered Salazar-Arp to file a *Martinez* report addressing the allegations and claims in Pavloff's complaint. (Doc. 12.) On July 11, 2008, Judge Armijo granted Pavloff leave to supplement his complaint. (Doc. 25.) Pavloff's supplemental complaint alleges additional acts of retaliation by Salazar-Arp following the filing of his civil rights suit and raises retaliation claims against a new defendant, Hermin Gonzales. (*See* Doc. 13.) Gonzales has not answered the supplemental complaint.

In response to my order, Salazar-Arp filed her first *Martinez* report on February 14, 2008. (Doc. 16.) After reviewing Pavloff's complaint and Salazar-Arp's *Martinez* report, I prepared Proposed Findings and Recommended Disposition (PFRD) recommending the dismissal of two of

---

[1] Pavloff's complaint consists of this Court's Prisoner's Civil Rights Complaint form, which has 6 numbered pages, followed by many unnumbered pages lacking a cohesive order. I have numbered the attached pages consecutively, beginning with page 7 and continuing to page 22. After page 22, the pages appear to be copies of documents submitted to prison officials and their responses to those documents. I consider these pages to be exhibits to the complaint, and I have numbered them consecutively beginning with page 1.

Pavloff's claims. (Doc. 20.) Construing Pavloff's complaint liberally,[2] I identified claims under the following constitutional and statutory provisions: 1) the Interstate Agreement on Detainers Act (IADA); 2) the Due Process Clause; 3) the Sixth Amendment; 4) the right to access the courts; 5) retaliation for the exercise of a fundamental right; and 6) the Eighth Amendment. On May 23, 2008, Judge Armijo adopted the PFRD and dismissed with prejudice Pavloff's claim alleging a violation of the Fourteenth Amendment's Due Process Clause for his transfer between prison facilities and his claim under the Sixth Amendment. (Doc. 22.) Judge Armijo also ordered Salazar-Arp to file a second *Martinez* report accompanied by a motion for summary judgment addressing the remaining claims. (*Id.*) This matter is before me now on Salazar-Arp's motion for summary judgment and second *Martinez* report.

## FACTUAL BACKGROUND

Pavloff entered the Central New Mexico Correctional Facility (CNMCF) on September 12, 2006. (Doc. 16 Ex. 1.) On October 10, 2006, his case worker informed him of a "misdemeanor warrant/detainer" lodged against him. (Doc. 1 at 7.) Two days later, Pavloff was transferred to the Western New Mexico Correctional Facility (WNMCF) and placed at classification Level II. (*Id.*) On March 22, 2007, Pavloff was transferred back to CNMCF.[3] (Doc. 16 Ex. 1.)

---

[2] *See Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519 (1972)).

[3] Pavloff claims he was transferred for medical treatment. (Doc. 18 at 4.) In the narrative portion of her second *Martinez* report, Salazar-Arp contends that Pavloff was transferred to CNMCF due to the discovery of a felony detainer. (Doc. 23 at 6.) This contention is not supported by document or affidavit. In fact, the documents attached to the second *Martinez* report state that, after being transferred to CNMCF, Pavloff was placed in interim Level VI "due to medical reasons." (*Id.* Ex. 11.) The documents further show that Pavloff was transferred to CNMCF on March 22, 2007 *before* the felony detainer was discovered on March 23, 2007. (*See* Doc. 16 Exs. 1, 2.)

On March 23, 2007, a classification officer discovered a "felony warrant/detainer lodg[ed] against" Pavloff in 1988. (Doc. 16 Ex. 2; Doc. 1 at 7.) Due to the felony detainer, Pavloff was increased to Level III classification. (Doc. 16 Ex. 6.) However, the documents attached to the second *Martinez* report show that he was placed in interim Level VI. (Doc. 23 Exs. 4, 11.) It appears that, with the exception of a brief transfer to the Lea County Corrections Facility, Pavloff remained in interim Level VI until he was transferred to general population Level III on April 25, 2007.[4] (*Id.* Ex. 4.) On April 10, 2007, Pavloff was inexplicably transferred to the Lea County facility and then returned to CNMCF on April 12, 2007.[5] (Doc. 16 Ex. 1.) Pavloff was released from CNMCF on February 2, 2008. (*Id.*) Between February 2, 2008 and August 22, 2008, Pavloff was on dual supervision including both probation and parole. (Doc. 23 Exs. 1, 2.) On August 22, 2008, Pavloff was arrested again and is presently incarcerated. (*Id.* Ex. 3.)

## SUMMARY JUDGMENT STANDARDS

Summary judgment should be granted when the record demonstrates "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56©. The record and all reasonable inferences therefrom must be viewed in the light most favorable to the party opposing summary judgment. *See Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998). A court cannot resolve material disputed factual issues by accepting a *Martinez* report's factual findings when they are in conflict with pleadings or affidavits. *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991). Likewise, summary judgment may not be

---

[4] Pavloff claims he was unconstitutionally subjected to 33 days of administrative segregation, which corresponds to the March 23 to April 25 time period.

[5] Classification Bureau Chief Jeff Serna has indicated that he has found no reason for Pavloff's transfer to and from the Lea County facility. (Doc. 28 Affidavit of Jeff Serna.)

predicated on statements in a *Martinez* report that are not sworn or not based on personal knowledge. *See Hayes v. Marriott*, 70 F.3d 1144, 1147-48 (10th Cir. 1995).

## DISCUSSION

### Violation of the Interstate Agreement on Detainers Act

Pavloff contends that Salazar-Arp violated his rights under the IADA when she refused to help him "clear up" the felony detainer by filing the necessary paperwork. (Doc. 1 at 9.) Article III of the IADA gives a prisoner incarcerated in one State the right to demand the speedy disposition of a detainer lodged against him by another State. *See Carchman v. Nash*, 473 U.S. 716, 719 (1985). To this end, Article III establishes procedures that a warden must follow when a detainer is lodged against a prisoner and the prisoner requests final disposition. *Id.* at 720-21. However, "[a] probation-violation charge, which does not accuse an individual with having committed a criminal offense in the sense of initiating a prosecution, [] does not come within the terms of Art. III." *Id.* at 725.

In my first assessment of Pavloff's claims, I noted that the first *Martinez* report did not indicate whether the felony detainer lodged against Pavloff was for an outstanding probation violation or an outstanding criminal charge. (Doc. 20 at 4-5.) The second *Martinez* report indicates that the felony detainer was for an outstanding probation violation. (Doc. 23 Ex. 4.) Because the probation violation detainer is not within the terms of Article III, Pavloff cannot claim a violation of the IADA. Accordingly, I recommend that summary judgment on this claim be granted.

### Remaining Due Process Claims

As I construed Pavloff's complaint in preparing the first PFRD, I determined that his due process claims arose from three events. The claims relating to two of these events remain: 1) Pavloff's contention that Salazar-Arp deprived him of "lump sum good-time and good-time credits,

and work/school opportunities" without due process and 2) Pavloff's contention that Salazar-Arp's decision to place him in administrative segregation deprived him of a liberty interest.[6] (*See* Doc. 20 at 5.)

*Deprivation of Good-Time Credits and*
*Work and Educational Opportunities*

With regard to the first event, Pavloff's complaint suggests that Salazar-Arp's refusal to help him "clear up" the felony detainer prolonged the existence of the detainer, and the pending detainer resulted in the loss of good-time credits and work and school opportunities without due process. (Doc. 1 at 10.) As described, Salazar-Arp was not required under the IADA to assist Pavloff in resolving a detainer for an outstanding probation violation. The question, then, is whether the restrictions imposed as a result of the felony detainer—the loss of good-time credits and the loss of work and educational opportunities—constituted due process violations.

In my first PFRD, I noted that a claim seeking the restoration of good-time credits is generally not cognizable under § 1983. *See Edwards v. Balisok*, 520 U.S. 641, 643-45 (1997). Similarly, a claim alleging deprivation of good-time credits without due process is not cognizable under § 1983. *Id.* at 646. "When a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973). Claims relating to the deprivation or restoration of good-time credits constitute such challenges to the fact or duration of a prisoner's custody. *See id.* at 487. Even where a prisoner seeks damages for a procedural violation rather than

---

[6] Judge Armijo dismissed with prejudice Pavloff's claims relating to the third event, his transfer from a medical to a non-medical facility.

the restoration of good-time credits that would shorten the period of confinement, the nature of the procedural challenge necessarily implies the invalidity of the deprivation, and therefore attacks the duration of imprisonment. *See Janke v. Price*, No. 96-1493, 1997 WL 537962, at *3 (10th Cir. Sept. 2, 1997) (unpublished) (citing *Edwards*' explanation that successfully establishing the procedural defect necessarily implies the invalidity of the deprivation of good-time credits). Thus, the sole remedy in federal court for deprivation of good-time credits is a writ of habeas corpus. *Edwards*, 520 U.S. at 646. Because Pavloff's due process claim involving the loss of lump sum good-time and good-time credits is not cognizable in a 1983 action, I recommend that summary judgment be granted.[7]

While habeas corpus is the only avenue for a prisoner challenging the fact or duration of confinement, a prisoner may use § 1983 to challenge the conditions of that confinement, including restrictions on work and educational opportunities due to a pending detainer. *See Boyce v. Ashcroft*, 251 F.3d 911, 914 (10th Cir. 2001), *vacated as moot*, 268 F.3d 953 (2001); *see also Mokone v. Fenton*, 710 F.2d 998, 1002 n.12 (3d Cir. 1983); *Pehler v. Schoen*, 537 F.2d 970, 971-72 (8th Cir. 1976). However, not every loss of work or educational opportunities triggers due process protection. *See Bulger v. U.S. Bureau of Prisons*, 65 F.3d 48, 50 (5th Cir. 1995). Pavloff must show that he was deprived of a liberty or property interest to which he was entitled under the Constitution or state law. *See Grady v. Edmonds*, No. 06-cv-01612, 2007 WL 2986167, at *8 (D. Colo. June 11,

---

[7] At the time I issued my first PFRD, Pavloff had been released from CNMCF and I questioned whether he might raise the loss of good time credits in a § 1983 action under an exception for prisoners not "in custody." *See Spencer v. Kemna*, 523 U.S. 1, 21 (1988) ("A former prisoner, no longer 'in custody,' may bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy the favorable-termination requirement that it would be impossible as a matter of law for him to satisfy."). This possibility is no longer relevant. Pavloff was incarcerated when he first filed suit and, although released on dual supervision when I issued the first PFRD, he is once again incarcerated.

2007) (citing *Templeman v. Gunter*, 16 F.3d 367, 369 (10th Cir. 1994)).

Pavloff has not made this showing. A prisoner does not have a constitutional right to work or educational opportunities. *Joseph v. U.S. Fed. Bureau of Prisons*, No. 00-cv-1208, 2000 WL 1532783, at *2 (10th Cir. Oct. 16, 2000) (unpublished) (citing *Templeman*, 16 F.3d at 370). While state statutes or prison regulations may create a liberty interest requiring due process protection, Pavloff has indicated no statutory or regulatory framework to suggest that New Mexico has created a liberty interest in prison employment or educational opportunities. Furthermore, a deprivation occasioned by prison conditions or prison regulations does not require procedural due process unless it imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006) (citing *Sandin v. Connor*, 515 U.S. 472, 484 (1995)). The second *Martinez* report indicates that Pavloff was assigned to work in the kitchen from April 25, 2007 until October 11, 2007, a period of six months following the discovery of the felony detainer. (Doc. 23 Ex. 4.) No programming information was provided for later dates. Pavloff did not respond or object to the second *Martinez* report. Keeping in mind that Pavloff did receive work assignments during six of the last ten months he was incarcerated before his February 2, 2008 release, Pavloff has not explained how his experience with work and educational assignments is atypical and significant when compared to the opportunities provided to other inmates. Pavloff's sparse allegations are insufficient to support a claim that Pavloff had a liberty interest in work and educational programming. Accordingly, I recommend that summary judgment be granted on Pavloff's due process claims involving the loss of work and educational opportunities.

*Administrative Segregation*

Pavloff's complaint also suggests that his placement in administrative segregation infringed

a liberty interest protected by the due process clause of the Fourteenth Amendment.[8] A decision to place an inmate in administrative segregation implicates the due process clause only where the confinement poses an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. In my previous PFRD analysis, I noted that a district court must examine the conditions of the prisoner's confinement and evaluate whether the administrative segregation mirrors "those conditions imposed upon inmates in administrative segregation and protective custody." *Gaines v. Stenseng*, 292 F.3d 1222, 1225-26 (10th Cir. 2002).

According to Pavloff, he spent 33 days in administrative segregation. (Doc. 1 at 8.) He claims that, as a result of his confinement to "super-max segregation," he was separated from the general population, and suffered from curtailed freedom of movement, the loss of a prison job and educational opportunities, the deprivation of outdoor exercise, and the loss of access to the courts. (*Id.* at 9.)

Salazar-Arp responds that Pavloff was never placed in "super-max segregation." (Doc. 23 Ex. 11.) She maintains that when Pavloff was transferred to CNMCF he was classified at Level III due to the felony detainer, but was placed in interim Level VI because no space was available in Level III. (*Id.* at 6, Ex. 11.)[9] On April 10, 2007, Pavloff was inexplicably transferred to the Lea

---

[8] The claim arises out of the 33 days Pavloff spent in administrative segregation from March 23, 2007 to April 25, 2007. (Doc. 1 at 8-11, 14.) Pavloff was also placed in administrative segregation on September 12, 2006. (Doc. 16 Ex. 9.) As I explained in my first PFRD, even under a liberal construction of Pavloff's complaint, this earlier placement in administrative segregation does not give rise to a claim under the Due Process Clause because Pavloff "was placed voluntarily" in administrative segregation "due to his claim of enemies." (Doc. 20 at 10; Doc. 16 Ex. 9.) Nevertheless, the bulk of Salazar-Arp's response regarding administrative segregation in her second *Martinez* report erroneously continues to focus on the segregation of September 2006, at the expense of addressing the legitimate claim arising out of the segregation of March 23-April 25, 2007.

[9] As explained above, the documents do not support Salazar-Arp's contention that Pavloff was *placed* in administrative segregation because no bed space was available; only that he *remained* at interim Level VI pending bed space. (Doc. 23 Ex. 11.)

8

County Corrections Facility and then returned to CNMCF on April 12, 2007. He was again placed in interim Level VI at CNMCF "pending processing through I.D." (*Id.* Ex. 11.) On April 25, 2007, he was released to general population Level III. (*Id.* Ex. 4.)

Salazar-Arp has provided information indicating that "[a]ll inmates in interim Level VI placement are treated similarly, losing rights and privileges that those inmates not in interim Level VI placement have." (Doc. 16 Ex. 7.) However, she provides no information comparing the length of Pavloff's stay in administrative segregation with that of other inmates. I note that such a comparison may be less useful when the reason for delay in interim Level VI is the lack of bed space at the proper classification level. The amount of time that passes before a bed becomes available necessarily varies, making differences between inmates in time spent in segregation less indicative of a due process violation. Nevertheless, a great disparity between inmates would raise concerns. Salazar-Arp has not provided any information to enable the court to evaluate any disparities. However, in this case, the short time that Pavloff spent in administrative segregation is not likely to be considered atypical or significant.

Several cases suggest that relatively short periods of confinement, without more, do not constitute an atypical and significant hardship. *See, e.g., Clayton v. Ward*, 232 F. App'x 827, 831 (10th Cir. 2007) (confinement of 26 days to administrative segregation considered to be "a relatively short duration" and, without more, did not constitute an atypical and significant hardship); *see also Gaines*, 292 F.3d at 1226 (noting that disciplinary segregation for less than 75 days might fail as a matter of law to satisfy "atypical and significant" requirement). Pavloff spent approximately nineteen days in interim Level VI pending bed space before being transferred to the Lea County facility. He then spent approximately fourteen days in interim Level VI on his return to CNMCF pending processing. Pavloff has provided nothing that suggests that these short periods of

9

administrative segregation for legitimate penological reasons—lack of bed space and inmate processing—constituted an atypical and significant hardship in relation to the ordinary incidents of prison life.  *See Mackey v. Dyke*, 111 F.3d 460, 463 (6th Cir. 1997) ("The delay in transferring Mackey was understandable given the corrections system's need to find him a bed at a suitable security level institution in an overcrowded prison system, with many prisoners needing the same type of transfer.").  I therefore recommend that summary judgment on Pavloff's due process claim arising out of his placement in administrative segregation be granted.

## Right to Access the Courts

In my first PFRD, I noted that Pavloff made several arguments alleging Salazar-Arp's interference with his right to access the courts and to access legal materials and I construed them as raising one claim for violation of the right to access the courts.  (Doc. 20 at 13-14.)  To show that Salazar-Arp violated his right to access the courts, Pavloff must demonstrate actual injury.  *See Lewis v. Casey*, 518 U.S. 343, 349-50 (1996).  Such injury occurs when, for example, a claim is lost or rejected on account of a defendants' misconduct or when a plaintiff's efforts to pursue an arguable claim are impeded.  *See id.* at 351, 353 n.4; *see also Simkins v. Bruce*, 406 F.3d 1239, 1244 (10th Cir. 2005); *Penrod v. Zavaras*, 94 F.3d 1399, 1403 (10th Cir. 1996).

Although it is difficult to ascertain the precise legal claim that Pavloff alleges was thwarted by Salazar-Arp's interference with his right to access the courts, a liberal construction of Pavloff's complaint suggests that Salazar-Arp's actions may have inhibited Pavloff from resolving the felony detainer.  In my first PFRD, I withheld a recommendation regarding Pavloff's access to the courts claim, pending more information on the nature of the felony detainer lodged against him and his corresponding rights under the IADA.  (Doc. 20 at 15.)  The second *Martinez* report clarifies that the felony detainer lodged against Pavloff was for an outstanding probation violation in California.

(Doc. 23 Ex. 4.)  As discussed above, the IADA only applies to detainers lodged on untried criminal charges and is not applicable to probation violation detainers.  *McDonald v. N.M. Parole Bd.*, 955 F.2d 631, 633 (10th Cir. 1991) (citing *Carchman*, 473 U.S. at 725-28).  As a result, Pavloff has no legal claim under the IADA regarding the probation violation detainer that could be thwarted by Salazar-Arp's interference with his right to access the courts.  Furthermore, a prisoner is not entitled to a probation-violation hearing until he is taken into custody pursuant to the probation violation warrant.  *See id.* (citing *Moody v. Daggett*, 429 U.S. 78, 86 (1976)).  Pavloff is not currently in custody for the California probation violation and California has conveyed that it will not extradite on the warrant.  (Doc. 1 Ex. 5, Doc. 16 Ex. 2, Doc. 23 Ex. 4.)  Pavloff has not demonstrated that he has suffered any injury due to the felony detainer that would give rise to a claim for violation of access to the courts.  Accordingly, I recommend that summary judgment on this claim be granted.

### Retaliation

In his original complaint, Pavloff alleges that Salazar-Arp retaliated against him following the discovery of the felony detainer by transferring him from a prison with a medical facility to one without a medical facility.  (Doc. 1 at 8.)  Pavloff contends that the retaliation was in response to his efforts to resolve the felony detainer and for filing a grievance complaining of the lack of assistance in resolving the detainer.  (*Id.* at 8, 9.)

In my first PFRD I concluded that, liberally construed, Pavloff's complaint sets forth "a chronology of events from which retaliation may be inferred" because Pavloff was transferred to the Lea County facility on April 10, 2007, one day after filing an informal complaint relating to the pending detainer.  *Dewalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 1999); *see also Smith v. Maschner*, 899 F.2d 940, 948 (10th Cir. 1990) (noting close temporal proximity of disciplinary action taken against prisoner immediately upon his return from court).  However, I was unable to determine

whether the transfer was prompted by retaliatory motive due to the lack of factual development on this point in the first *Martinez* report.  The second *Martinez* report was also devoid of any explanation for the two-day transfer to the Lea County facility.  As a result, on October 23, 2008, I ordered Salzar-Arp to file a supplemental *Martinez* report on this point.  (Doc. 27.)  The supplemental report has finally clarified several points relating to Pavloff's retaliation claim against Salazar-Arp.

Before his transfer to the Lea County facility, Pavloff filed several grievances related to the pending felony detainer.  On April 2, 2007,[10] he filed an informal complaint against "classification" regarding his placement in segregation because of the pending detainer.  (Doc. 23 Ex. 12.)  On April 9, 2007, he filed another informal complaint against "classification committee CNMCF" regarding his classification at Level III because of the pending detainer.  (*Id.*)  Neither grievance specifically names Salazar-Arp.  In an affidavit attached to her supplemental *Martinez* report, Salazar-Arp states that she did not become Pavloff's classification officer until April 12, 2007, after his return from the Lea County facility.  (Doc. 28 Affidavit of Salazar-Arp.)  She further states that she did not commit Pavloff for a transfer of custody and had no knowledge of his transfer.  (*Id.*)  Pavloff did not respond or object to the supplemental *Martinez* report.  Since it appears that Salazar-Arp was not the subject of Pavloff's grievances in early April, I find no basis to suspect that Pavloff's transfer to the Lea County facility was the product of retaliation by Salazar-Arp and therefore recommend that summary judgment on this claim be granted.

In his supplemental complaint, Pavloff claims that Salazar-Arp further retaliated against him following the filing of his original complaint by altering his release date and failing to correct errors

---

[10] The grievance was signed by Pavloff on April 2, 2007 but marked "received" and "reviewed" on April 9, 2007.  (Doc. 23 Ex. 12.)

in his release date. (Doc. 13 at 2.) In addition, Pavloff raises retaliation claims against a new defendant, Hermin Gonzales. Pavloff alleges that, after filing his civil rights suit against Salazar-Arp, Gonzales retaliated against him by verbally harassing him with "four letter words" such as asking him if he "[got his] f***ing library books to decorate [his] f***ing cell." (*Id.* at 3.) Pavloff also alleges that, on October 9, 2007, Gonzales physically abused him by "kick[ing] the infurmary [sic] door . . . into [him]" and on November 28, 2007 Gonzales searched and destroyed his room, read his legal papers and confiscated personal items and papers. (*Id.* at 4.) Pavloff claims that none of these retaliatory acts occurred until "the civil complaint filed [sic] and grievance filed [sic]." (*Id.* at 5.)

"Prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights." *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998). "This principle applies even where the action taken in retaliation would be otherwise permissible." *Id.* It is well established that access to the courts is one of the fundamental rights protected by the Constitution. *Smith*, 899 F.2d at 947. When making a claim of retaliation, a plaintiff must plead facts evincing a retaliatory motive to avoid dismissal. *See DeSpain v. Uphoff*, No. 99-8106, 2000 WL 1228003, *4 (10th Cir Aug. 30, 2000) (unpublished) (citing *Frazier v. Dubois*, 922 F.2d 560, 562 n.1 (10th Cir. 1990)).

Pavloff alleges no facts regarding the changes in his release date that suggest retaliatory motive on the part of Salazar-Arp. He claims that his release date changed nine times in two months and provides a list of nine dates. (Doc. 13 at 2.) But he provides no information regarding when these changes occurred in relation to the filing of his civil rights complaint from which one could infer a retaliatory motive. Furthermore, all but two of the dates Pavloff lists are earlier than the release date of February 12, 2008 projected by CNMCF when Pavloff was first transferred to that

facility in March 2007.  (*See* Doc. 16 Ex. 6.)  In other words, the changes would have released Pavloff sooner than originally projected.  Finally, in the second *Martinez* report, Salazar-Arp clarifies that as a classification officer, she had no control over Pavloff's release date.  (Doc. 23 Ex. 7.)  In short, Pavloff has failed to state a claim for retaliation against Salazar-Arp in regard to the changing of his release date and I recommend that this claim be dismissed.

Similarly, with regard to Defendant Gonzales, Pavloff has not pleaded facts evincing a retaliatory motive.  The only relationship between the alleged incidents that Pavloff describes and the filing of his civil rights complaint is that the incidents occurred after Pavloff filed the complaint.  Such chronological progression may, in some cases, constitute circumstantial evidence from which a retaliatory motive can be inferred.  *See Smith*, 899 F.2d at 649 (citing *McDonald v. Hall*, 610 F.2d 16, 18 (1st Cir. 1979)).  In *Smith*, the court found that the disciplinary action taken against the prisoner immediately upon his return to the detention facility from a court proceeding could support an inference of retaliatory motive.  *Id.* at 648.  In this case, however, the first of the alleged verbal harassment incidents occurred three months after the complaint was filed.  (*See* Doc. 13 at 3.)  This chronological relationship is too tenuous to evince retaliatory motive.  Furthermore, Pavloff pleads no facts that suggest that the search of his room and the "reading [of] his legal papers" four months after he filed suit was motivated by his legal action.  Pavloff has failed to allege facts supporting a claim of retaliation against Gonzales and therefore this claim should also be dismissed.

## Eighth Amendment

Pavloff claims violations of the Eighth Amendment's prohibition on cruel and unusual punishment arising out of his transfer from CNMCF to the Lea County Correctional Facility, and his placement in "super-max" segregation.  (Doc. 1 at 9; Doc. 18 at 5.)  Pavloff alleges that, at the time of his transfer to the Lea County facility, he was undergoing treatment for HIV/AIDS and

Hepatitis C, and that, during the transfer he suffered from "major pain dehidration [sic] and no food during the transfer 5/12 hour [] due to the prison officials [sic] retaliation." (Doc. 1 at 9.) As I described in the first PFRD, "prison officials violate the Eighth Amendment's ban on cruel and unusual punishment if their 'deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain.'" *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). The test for deliberate indifference has both an objective and subjective component. *Kikumura v. Osagie*, 461 F.3d 1269, 1291(10th cir. 2006). In the first PFRD, I concluded that Pavloff had alleged facts sufficient to satisfy the objective component. (Doc. 20 at 18.) I was unable to determine, however, whether the subjective component was met because Salazar-Arp's first *Martinez* report omitted any reference to her subjective knowledge of Pavloff's medical condition or Pavloff's transfer to the Lea County facility. (*Id.* at 19.)

In the first PFRD, I explained that the focus of Salazar-Arp's first *Martinez* report, on the transport log and the knowledge of the transportation officers, was misplaced because a defendant's liability for deliberate indifference hinges on the defendant's own knowledge of a plaintiff's medical needs. (*Id.*) Nevertheless, Salazar-Arp's second *Martinez* report was again devoid of any information regarding her knowledge of Pavloff's medical needs or the transfer to the Lea County facility, and instead focused on justifying Pavloff's placement in interim Level VI segregation at CNMCF in September 2006, March 2007 and April 2007. As a result, on October 23, 2008, I ordered Salazar-Arp to submit a supplement *Martinez* report addressing Pavloff's Eighth Amendment claims in terms of Salazar-Arp's knowledge of his medical condition and transfer to the Lea County facility. (Doc. 27.)

Salazar-Arp's supplemental Martinez report clarifies that she had no knowledge of Pavloff's

medical history or medical condition and further that she never committed Pavloff for transfer while he was incarcerated by the New Mexico Corrections Department. (Doc. 28 Affidavit of Salazar-Arp.) Since Salazar-Arp had no knowledge of Pavloff's medical needs at the time of his transfer to the Lea County facility or his return to CNMCF, there is no reason to believe that she was aware of an excessive risk to Pavloff's health and safety and deliberately disregarded it. Accordingly, I recommend that summary judgment be granted on Pavloff's Eighth Amendment claim.[11]

## CONCLUSION

For the reasons set forth above, I recommend that the claims in Pavloff's supplemental complaint alleging retaliation by Salazar-Arp and Hermin Gonzales following the filing of his original complaint be dismissed with prejudice. I further recommend that summary judgment be granted on all remaining claims and that this case be dismissed.

**THE PARTIES ARE NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636 (b)(1). **A party must file any objections with the Clerk of the District Court within the ten-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

WILLIAM P. LYNCH
UNITED STATES MAGISTRATE JUDGE

---

[11] Salazar-Arp did not move for summary judgment on this claim in her motion for summary judgment. Nevertheless, the parties were given notice that the *Martinez* reports may be used in deciding whether to grant summary judgment *sua sponte* so this recommendation is appropriate.